IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs September 20, 2010

## CHARLES JUSTIN WRIGHT, BY NEXT FRIEND AND MOTHER, KAREN PRYOR v. CITY OF LEBANON, TENNESSEE

**Appeal from the Circuit Court for Wilson County**
**No. 14,856      John D. Wootten, Jr., Judge**

---

**No. M2010-00207-COA-R3-CV - Filed March 1, 2011**

---

In a Governmental Tort Liability Act ("GTLA") action, the City of Lebanon appeals the trial court's decision to hold it liable for an accident that occurred on a swing in a city park. The City asserts that the court erred in failing to find that the swing was in a dangerous or defective condition or that the City had notice of such a condition. Additionally, the City insists that any defective condition was latent and governmental immunity was therefore not removed under the GTLA. The City also challenges the trial court's denial of its motion for involuntary dismissal, its characterization of the case as "hybrid" in nature, its reliance on the doctrine of res ipsa loquitur in establishing negligence, and its admission of the plaintiff's expert testimony. We conclude that the swing was in a dangerous or defective condition, which was not latent, and that the City had constructive notice of that condition. We find against the City on its remaining issues.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which PATRICIA J. COTTRELL, P.J., M.S., and RICHARD H. DINKINS, J., joined.

Stephen W. Elliott, Nashville, Tennessee, for the appellant, City of Lebanon, Tennessee.

Amber St. John, Smyrna, Tennessee, for the appellee, Charles Justin Wright.

### OPINION

#### FACTUAL AND PROCEDURAL BACKGROUND

On Saturday, April 15, 2006, fourteen-year-old Charles Justin Wright attended a birthday party at Don Fox Park in Lebanon, Tennessee, with his mother, stepfather, sister,

and cousin. The park is owned and maintained by the City of Lebanon. Wright was injured while swinging on the swings at the park. The plaintiff claims that a hook attaching the seat of the swing to the chain came loose as he was swinging, and as a result, he fell and broke his ankle.

On April 13, 2007, Wright, through his mother and next friend, brought suit against the City pursuant to the Tennessee Governmental Tort Liability Act, Tenn. Code Ann. § 29-20-101 *et seq*. The plaintiff claimed that immunity of governmental entities was removed for injury from dangerous structures under Tenn. Code Ann. § 29-20-204 and for injury caused by a negligent act or omission of an employee under Tenn. Code Ann. § 29-20-205. The complaint asserted that the condition of the swing created a dangerous or defective condition, the City had constructive and/or actual notice of the dangerous or defective condition, the City had a duty to conduct reasonable and customary inspections of the swing and failed to do so, and the City was negligent in failing to maintain and/or properly repair the swing. The City denied liability and asserted several affirmative defenses.

A bench trial was held on October 8 and 9, 2009. Witnesses included the plaintiff, the plaintiff's mother, the plaintiff's stepfather, the park attendant at Don Fox Park, the director of the Parks Department, a woman who was also at the swing when the accident occurred, an orthopaedic surgeon who treated Wright, the plaintiff's expert, and the defendant's expert. At the close of the plaintiff's proof, the City filed a motion for involuntary dismissal pursuant to Tenn. R. Civ. P. 41.02. The City argued that the plaintiff failed to demonstrate that the City created a dangerous condition that was the cause of his injury or that the City had notice of a dangerous condition. The court denied the City's motion. Following the trial, the court announced its findings of fact and conclusions of law, which were incorporated into the final order, dated November 9, 2009. The court began by stating that the plaintiff clearly established four of the five elements of negligence, and that "the key issue in this case" is whether there was a breach of the duty the City owed to Wright. The court concluded that the City had a "higher duty" to ensure the safety of the swings. The court found for Wright in the amount of $42,000, plus court costs. Wright was also granted $9,137.92 in discretionary costs.

STANDARD OF REVIEW

We review a trial court's findings of fact de novo with a presumption of correctness unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d). If the trial court fails to make findings of fact, our review is de novo with no presumption of correctness. *Halliburton v. Town of Halls*, 295 S.W.3d 636, 638 (Tenn. Ct. App. 2008). We review questions of law de novo with no presumption of correctness. *Nelson v. Wal-Mart Stores, Inc.*, 8 S.W.3d 625, 628 (Tenn. 1999).

ANALYSIS

The City raises the following issues on appeal:

• Whether the trial court erred in failing to determine whether the swing was in a dangerous or defective condition at the time of Wright's injury.

• Whether the trial court erred in failing to determine whether the City had constructive notice of a dangerous or defective condition at the time of Wright's injury.

• Whether the trial court erred in denying the City's motion for involuntary dismissal at the close of the plaintiff's case in chief.

• Whether any defective condition of the swing was a latent defective condition.

• Whether the trial court erred in construing this as a "hybrid case."

• Whether the trial court erred in applying the doctrine of res ipsa loquitur.

• Whether the trial court erred in admitting the testimony of Robert Warren.

Dangerous or Defective Condition

Subject to statutory exceptions, the Governmental Tort Liability Act generally offers immunity to governmental entities from suit for any injury which may result from the activities of such governmental entities. Tenn. Code Ann. § 29-20-201(a). One statutory exception exists "for any injury caused by the dangerous or defective condition of any public building, structure, dam, reservoir or other public improvement owned and controlled by such governmental entity." Tenn. Code Ann. § 29-20-204(a). However, "[i]mmunity is not removed for latent defective conditions" or in instances where the governmental entity did not have "constructive and/or actual notice" of the condition. Tenn. Code Ann. § 29-20-204(b). Thus, in order to succeed in its GTLA claim under Tenn. Code Ann. § 29-20-204, Wright needs to establish that there was both a dangerous or defective condition and that the City had notice of the condition.

The City correctly states that the trial court did not make a finding that the swing was in a dangerous or defective condition. The court announced certain findings of fact and conclusions of law from the bench, which were incorporated into its final order. The court stated that, based on a photograph of the swings taken after the accident, the "top S hook . . . is, greater than .04 inches or greater than one millimeter wide." The court again stated that

-3-

"there are gaps here in this S hook." The court also noted that Robert Warren, the plaintiff's expert, offered "a plausible, believable explanation as to how this particular S hook could become disengaged." The City insists that the trial court's failure to make a specific finding as to whether the swing was in a dangerous or defective condition is fatal to the plaintiff's claim. However, "if the trial judge has not made a specific finding of fact on a particular matter, we review the record to determine where the preponderance of the evidence lies without employing a presumption of correctness." *Rawlings v. John Hancock Mut. Life Ins. Co.*, 78 S.W.3d 291, 296 (Tenn. Ct. App. 2001). Therefore, we must examine the evidence to determine whether the swing was in a dangerous or defective condition.

On the night of the accident, Wright and his cousin were swinging on the swings at the playground area while other members of their family were participating in a birthday party at a nearby pavilion. Initially, Wright's cousin was swinging in the swing that would later break, and he experienced no problems with the swing at the time. The boys took a five-minute water break and, when they returned, they switched swings. When they resumed swinging, Wright's swing broke. Wright fell to the ground and broke his ankle. Wright testified that the swing broke "right as I was going forward, like right in the middle." He further stated that he was not up in the air and he had not yet brought his legs forward. A photo taken by one of the parents at the birthday party shortly after the accident shows Wright, crying and holding his leg, on the ground next to the broken swing. In the photo, the seat of the swing is still attached to one of the two chains. The seat came undone at the point where it attached to the other chain.

Wright's stepfather, Bedford Allison, testified that he inspected the swing shortly after the accident while he was waiting with Wright for his mother to come over. He stated that "the S-hook at the bottom of the swing [chain] appeared to be stretched out." Thus, he could "only assume the chain came out of the s-hook." Allison testified that the S-hook was stretched out as wide as his pinky, which he estimated to be one-quarter to one-half inch. Allison stated that, in his job as a commercial driver, he had occasion to work with chains and S-hooks "every day for the last 12 years." He also had experience with them working in construction and growing up on a farm.

Sandra Lascher Zires was the only disinterested party present at the time of the accident. She was pushing her daughter on the same swing set on which Wright and his cousin were swinging when Wright fell. Zires testified that the boys were swinging in a normal manner and that Wright was swinging at a "medium" height. Zires testified that, when she looked up after the accident, the seat of the swing was hanging down. Zires, who was once certified as an EMT with the Air Force, went over to assist Wright. At some point, she inspected the swing. When asked what her impression was of what had gone wrong with the swing, Zires testified, "Well, I kind of expected a chain to be broken, but there wasn't.

-4-

It was just an S-hook, I'm guessing, came off. I don't know. It didn't appear to be broken." Zires later stated, "I'm certain that [the S-hook] came loose." She testified that the S-hook was still hanging from the chain and was not down on the ground.

The City was in possession of a "care packet" created by the manufacturer of the swings, Leathers & Associates, Inc. The packet states that S-hook connectors are considered closed when there is no gap or space greater than .04 inches. Further, the packet states that "[i]f S-hooks open, they should be replaced, as reclosing S-hooks weakens them." As a semi-annual check, Leathers & Associates suggests checking to ensure that chains, S-hooks, and quick links are not worn more than one-third. The packet, however, notes that such frequencies "should not be taken as absolutes" and that there is "no substitute for professional judgment in determining inspection frequency." In a "Maintenance Update" from May 2000, Leathers & Associates states that chains, S-hooks, and quick links should be replaced "if wear is greater than 50%."

William Porter, the director of the Parks Department, testified about the City's practices in maintaining Don Fox Park. Porter testified that his team of five workers check the park every day. Porter stated that he and his crew inspect S-hooks, quick links, and chains on the swings daily. Porter specifically testified that the crew checks daily to ensure that the S-hooks are fully closed and that S-hooks and chains are not over 50% worn or rusted. Every member of the team knows how to fix these items. If there is a problem with a chain, S-hook, or quick link, the crew can fix it on the spot because they keep those items and the tools to fix them in their trucks. When asked what exactly he looks for when inspecting a swing, Porter responded as follows:

> I lift up where the swing attaches to either the S-hooks or the chain and generally take the two pieces of chain and, kind of, move them where you can see if there is worn—whether it's worn in there. I pull and jerk on the top, pull on the chains to make sure they are tight, not coming loose at the top. I look at the bolts and try to look and see if any of those look like they are loose or working their way off nuts or something. I feel about the edges of the seats.

Porter testified that, based on his crew's routine, the particular swing that broke would have been checked on Friday, the day before the accident. While Porter was unaware of the exact .04 inch guideline for open S-hooks at the time of the accident, he testified that it was his practice to see if a chain could come out of an S-hook. The City was in the habit of both closing and replacing open S-hooks. Porter stated that every member of his team knows how to close an open S-hook.

-5-

Porter also testified about the maintenance records his team kept. The system for doing so was not formal and was not done consistently. Documents in the record reflect that, at various times, the park team maintained two different types of records. One form, labeled "Park Responsibilities," consists of boxes to be checked each day of the week for various completed tasks, including one for "playground safety check." Another form, labeled "Duty: Safety Check Playgrounds," consists of blank lines under the headings "time done," "initial," "date," and "comments." Examples of entries on this second form include "fixed tired swing S-hook," "tightened bolts on swings," "fixed ladder on red fire engine," "sprayed wasp nest," and "replaced swing in playground." None of these documents shed any light on the condition of the swings at the park around the time of the accident.

Robert Warren, a structural engineer, was the plaintiff's expert witness. His expertise relative to this case lies in his knowledge of physics and metallurgy. Warren has limited experience in playground maintenance. He acknowledged that, prior to trial, he was unfamiliar with maintenance and safety protocol for playground equipment but that he was familiar at the time of trial. Warren testified about S-hooks wearing with age and opening as a result. Warren stated that repeated opening and closing of S-hooks increases fatigue and is more likely to cause a fracture. He therefore recommended replacement of S-hooks after they are tightened or closed for the second time. Warren noted that, for maintenance purposes, there should be a system of labeling individual swings to document the times the S-hooks are tightened. Warren stated that none of the City's methods rose to that level.

Warren stated that he did not know whether an S-hook broke, was too far open, or whether it was a combination of the two. He opined that it was more likely that the S-hook was open. He based this conclusion largely on Allison's testimony about the condition of the S-hook following the accident. He stated that, although he did not know how much wear existed at the time of the accident, there would not need to be much if the gap in the S-hook was as great as Allison indicated. He also testified that it was highly unlikely that an S-hook would break.

When asked how he thought the accident occurred, Warren speculated that, despite Wright's testimony that he thought the swing broke as he was coming forward at the bottom of his swinging motion, it was most likely that the swing broke when Wright was in his backswing, near the bottom of the swinging arc, with his legs underneath him. Warren's theory for how the accident occurred is that the swing was resting on the edge of a partially open gap in an S-hook,[1] either when Wright's cousin was swinging or once Wright himself

---

[1] The evidence suggested that the seat of the swing attached to the chain via either one or two S-hooks. Because an S-hook was still attached to the chain after the accident, Warren surmised that the open

(continued...)

began to swing. This would have happened when one of the boys was swinging high enough for there to be slack in the chain at the highest point of their swinging motion. Warren noted that if a link were on the edge of an S-hook, once pressure is applied, the link would either fall in one direction (back into the S-hook) or the other (out of the S-hook). Warren's theory was that when Wright came back down into his backswing and his weight was a force on the seat of the swing, the link popped out of the S-hook and the seat came undone from the chain.

Scott Burton, a recreation safety consultant specializing in playground safety, was the City's expert witness. He is a certified playground safety inspector through the National Recreation and Park Association, sits on subcommittees of the American Society for Testing and Materials, and once owned a company that designed and manufactured playground equipment for twelve years. At the time of trial, he owned a company that performed playground safety audits.

Burton testified that there is no national standard for when to tighten S-hooks as opposed to replace them. He stated that closing S-hooks for a third time might be acceptable, but beyond that, they should probably be replaced. He characterized the decision as one of professional judgment. Burton testified that the City's inspections were reasonable and above the standard of care. He stated that he typically recommends checking S-hooks monthly.

Burton had no explanation for how the accident could have occurred. He stated, "If it was fine for Jeffrey [Wright's cousin] to be on it, then I don't know what happened during that four or five minute time period. Obviously, it was fine when he was using it and fine with other children and possibly adults, who knows, before that." Burton stated that the most likely time that a chain would unhook from an S-hook is at the height of one's swinging motion. He had no explanation for how an S-hook could unhook at the position in which Wright described the accident as occurring (at the lowest point of his swinging motion), even if the S-hook was open greater than .04 inches. Burton was asked whether an open S-hook could be an explanation for how the accident occurred. He responded:

> It's difficult for me to wrap my head around how it would be. It's possible that
> it was open more than .04 inches, like some other playgrounds I've seen, but
> I have never heard of an individual, a human, falling or anyone falling off a

---

[1](...continued)
gap must have been in the lower half of an S-hook. Thus, the open S-hook could have connected to either an S-hook below it or the seat of the swing below it.

playground swing because the S-hook was opened up to that point and to be able to prove it. I just haven't seen it.

Burton acknowledged on cross examination: "[I]f it's [the gap] more than .04 inches, then if it's opened up an inch, then, yeah, you can pull the thing [the seat or chain] off. It's not a frequent thing that happens, though." Burton disputed that the accident could have occurred in the manner that Warren discussed because Wright would have needed to be swinging higher than what he described in order for a link to become lodged in an open S-hook.[2]

Our review of the record reveals that the plaintiff established, by a preponderance of the evidence, that the swing was in a dangerous or defective condition. There is no evidence that the boys were using the swings inappropriately. The photographs taken the night of the accident show that the swing came undone at the place where the seat attaches to an S-hook. There was testimony from Allison that the S-hook at the bottom of the chain appeared to be stretched out. There was testimony from a disinterested observer that an S-hook came off the chain. The plaintiff's expert offered a reasonable explanation for how the seat could have become unhooked from an open S-hook. The City's expert testified that, while unlikely, it was possible for an open S-hook to cause a seat to come off.

Constructive Notice

In order for the City's immunity to be removed, the plaintiff must also prove that the City had actual or constructive notice of the condition. Tenn. Code Ann. § 29-20-204(b). The trial court failed to make a finding with respect to notice. Both parties agree that the City did not have actual notice of the defective condition, but the plaintiff contends that the City did have constructive notice. The issue of whether the City had constructive notice is a question of fact. *See Petty v. City of White House*, No. M2008-02453-COA-R3-CV, 2009 WL 2767140, at *6 (Tenn. Ct. App. Aug. 31, 2009).

Constructive notice has been defined as "information or knowledge of a fact imputed by law to a person (although he may not actually have it), because he could have discovered the fact by proper diligence, and his situation was such as to cast upon him the duty of inquiring into it." *Kirby v. Macon County*, 892 S.W.2d 403, 409 (Tenn. 1994) (quoting

---

[2] Burton also noted his skepticism of the plaintiff's version of events in general. He went so far as to say that the photograph taken of Wright shortly after the accident looked "like a posed picture." Burton testified: "[I]t looks like the plaintiff is laying there posing with his foot out, shoe off, when there is other testimony that there was such great concern to get him into the truck and off to the hospital, it just doesn't jive with each other."

BLACK'S LAW DICTIONARY, 1062 (6th ed. 1990)). Our Supreme Court has determined that "a governmental entity will be charged with constructive notice of a fact or information, if the fact or information could have been discovered by reasonable diligence and the governmental entity had a duty to exercise reasonable diligence to inquire into the matter." *Hawks v. City of Westmoreland*, 960 S.W.2d 10, 15 (Tenn. 1997). Further, "[p]roof that a governmental entity failed to adequately inspect property or improvements which it owned and controlled is directly relevant to the question of whether it had constructive notice of the dangerous or defective condition resulting in injury." *Id.* at 16.

The City claims that, because Wright's cousin used the swing with no trouble just five minutes before the injury to Wright, the City could not have been constructively on notice for any dangerous or defective condition in that five-minute time period. The City seems to think it must have been notified of a defective condition before it can have constructive notice. Constructive notice depends not on when an injury occurs but on when a governmental entity fails to exercise reasonable diligence. *Id.* at 15. The fact that no accident occurred prior to Wright's accident does not mean the swing was not in a dangerous or defective condition at that time. Both experts testified that it would take just the right circumstances for an accident of this nature to occur. The swing could have been in a defective condition for days, weeks, or months. The City's assertion that there were no prior accidents or notifications is more relevant to whether the City had actual notice, not constructive notice.

Testimony from park employees suggested that the park was generally well-maintained and that safety was a primary concern.[3] The director of the Parks Department testified that he and his crew of four check daily to ensure that S-hooks are fully closed and that S-hooks and chains are not over 50% worn or rusted. However, Porter acknowledged that it was impossible for park staff to catch every instance of broken equipment as soon as it occurred. Porter stated, "If we're looking every day at swings and chains and for screws and cleaning up and picking up, we hope that if we missed it one day we'll catch it the next day." Unfortunately, there is no documentation that reveals which swings were checked on particular days and in what manner they were checked.

No one member of Porter's crew is assigned a specific area of Don Fox Park to inspect. When asked what the crew does when they arrive at the park each day, Porter

---

[3] While the trial court did not make a finding as to whether the City had notice of a defective condition, the trial court made the following statements about the condition of the park generally: the director of the Parks Department "has done a very good job," "[t]he city has taken great pride in that park," "it's well kept up," "[t]hey go out there . . . every day to police the area," and "they were doing the best they could in trying to make this a place for the public and, particularly, children to play in a safe environment."

responded: "Rake the playground, blow off pavilions, pick up trash. Take five, and that way we can generally, if everybody takes a spot, if nothing is wrong and everything is good, we're in and out in 20 minutes and back up at the ball parks." Given the lack of a formal system of inspection or record-keeping, it is understandable that some areas of the park could go overlooked at various times.

Warren testified that S-hooks do not open overnight, but rather, open slowly over a period of time. Burton stated that he typically recommends checking S-hooks only monthly. That means the park staff likely would have missed the open S-hook over a period of time, not just from Friday, when it was allegedly last checked, to Saturday, the day of the accident. The park staff was well aware of this tendency of S-hooks to open up or wear over time. Each member of the crew knew how to close open S-hooks, and extra S-hooks were kept in the park trucks for easy replacement.

Based on the evidence presented, we conclude that the defective condition of the swing that caused Wright's accident could have been discovered by reasonable diligence through thorough inspections. Therefore, the City must be charged with constructive notice of the condition pursuant to Tenn. Code Ann. § 29-20-204(b).

## Motion for Involuntary Dismissal

The defendants argue that "[i]n light of Wright's failure to prove a dangerous, defective, or unsafe condition that Lebanon had actual or constructive notice of, the trial court should have granted Lebanon's motion for involuntary dismissal." This issue has been rendered moot since we have concluded that the plaintiff established, by a preponderance of the evidence, that the swing was in a dangerous or defective condition and the City had constructive notice of the condition.

## Latent Defective Condition

The City next argues that, if the swing was in a dangerous or defective condition, it was a latent defective condition, for which immunity from suit of a governmental entity is not removed pursuant to Tenn. Code Ann. § 29-20-204(b).

"Latent defect" has been defined as "[a] hidden or concealed defect . . . which could not be discovered by reasonable and customary inspection." *Hawks*, 960 S.W.2d at 17 (quoting BLACK'S LAW DICTIONARY, 794 (5th ed. 1979)). In construing the same language, the Utah Supreme Court has held that a latent defect is "[a] defect which reasonably careful inspection will not reveal." *Id.* (quoting *Vincent v. Salt Lake County*, 583 P.2d 105, 107 (Utah 1978)).

The City repeats its previous argument that Wright's cousin swung accident-free minutes before Wright did so. The City argues that "[i]t would not be fair to hold Lebanon accountable for making a 'reasonable' inspection in the less than five minute time period when [Wright's cousin] stopped swinging and when Wright began swinging."

The City misunderstands the concept of a latent defect in the same manner that it misunderstands the concept of constructive notice, as discussed above. There is no time frame associated with what may be revealed by a reasonable inspection. The swing may have been in a defective condition for days, weeks, or months. Additionally, an open S-hook does not qualify as a hidden or concealed defect. The park staff was trained to look for just that sort of defect, and allegedly did so every day. The defect in the swing was not latent, and the City's immunity is removed under the language of Tenn. Code Ann. § 29-20-204.

## Trial Court Reference to "Hybrid Case"

In making its ruling from the bench on October 9, 2009, the trial court announced certain findings of fact and conclusions of law. The City challenges the trial court's reference to this case as a "hybrid case." We must consider the court's remark in context:

> Now, has there been a breach of the duty? I read some cases. I've read a lot of cases. There was some discussion at the end of this case in the attorneys' final remarks about this concept of res ipsa and this concept about whether or not the instrumentality that has caused the injury because it's moving does that create a higher duty.
>
> You know, this is kind of a hybrid case I think. I don't think there is any question there has been some inspection, but I think there is a higher duty when instrumentality can cause the injury in this case. So, I mention this in passing.

The court goes on to discuss the testimony of the experts and its opinion that the plaintiff carried its burden of proof in this case.

The precise contours of the City's argument on this point are unclear. The City states that because "there is no such legal concept [of a hybrid case] under the GTLA," it was "impermissible" for the court to mention it. The City seems to imply that the court's reference to a "hybrid case" means the court did not construe the case under the GTLA. We find this argument to be without merit as we have concluded that the plaintiff met all of the requirements under the GTLA.

<u>Trial Court Reference to Res Ipsa Loquitur</u>

The City also challenges the trial court's reference to the doctrine of res ipsa loquitur, arguing that reliance on the doctrine was harmful and reversible error. The court stated the following in making its ruling:

Although this case is difficult and this case is close, I think the plaintiff has carried its burden of proof in this case. I find particularly that the doctrine of res ipsa is very persuasive here. I use a holding in the Parker case[4] where the thing causing the harm is shown to be under the management of the defendant and the accident as such as in the ordinary course of things does not happen if those who have the management use proper care. It affords reasonable evidence, in the absence of explanation by the defendant, that the accident arose from want of care.

I am persuaded by that particular holding in that 1973 case that is reported in this state. This particular swing, which is a moving part, obviously used—I think I can infer from the proof in this case and common knowledge in a city park is used a lot. Although it imposes a burden upon the city in many ways, the city has to have a higher duty to make sure that children who are going to be attracted to these type of things, be they 14 year olds or 5 year olds, that it is under their care and their maintenance.

The City asserts that "Wright realized he could not make a case under the GTLA to fulfill the statutory requirements of dangerous or defective condition and notice, so he traveled under a specialized doctrine that allowed him to use circumstantial evidence and, in essence, not have to prove a dangerous or defective condition or notice." The City argues that this was impermissible because it allowed Wright "to skip the analysis of whether sovereign immunity is removed."

While the trial court's discussion of res ipsa loquitur was not relevant to a finding of a dangerous or defective condition or notice as required by the portion of the GTLA relied upon by the plaintiff, this court has analyzed the case under section 29-20-204 of the GTLA and concluded that the City's immunity was removed.

---

[4] The court refers to *Parker v. Warren*, 503 S.W.2d 938 (Tenn. Ct. App. 1973).

-12-

<u>Admission of Robert Warren's Testimony</u>

The City claims that Warren did not qualify as an expert to render testimony on whether the swing was dangerous or defective.  The City insists that expert testimony was needed with respect to playground equipment and recreational safety, and Warren is not an expert in those areas.  Therefore, the City claims that Warren's testimony was not relevant under Tenn. R. Evid. 401, did not substantially assist the trier of fact under Tenn. R. Evid. 702, and gave rise to a lack of trustworthiness with respect to his opinions under Tenn. R. Evid. 703.

"[A]ppellate courts review a trial court's decisions regarding the competency of experts and the relevance of their testimony . . . using the 'abuse of discretion' standard." *Johnson v. John Hancock Funds*, 217 S.W.3d 414, 425 (Tenn. Ct. App. 2006).  Under that standard, we are required to uphold the trial court's ruling "as long as reasonable minds could disagree about its correctness."  *Caldwell v. Hill*, 250 S.W.3d 865, 869 (Tenn. Ct. App. 2007).  So, "we are not permitted to substitute our judgment for that of the trial court."  *Id*.  An appellate court "will set aside a discretionary decision only when the trial court has misconstrued or misapplied the controlling legal principles or has acted inconsistently with the substantial weight of the evidence."  *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 223 (Tenn. Ct. App. 1999).

The City does not make specific arguments with regard to the three rules of evidence on which it bases its challenge.  The City's position seems to be that Warren's testimony should have been excluded because his education and training are not specific to playground equipment.

Tenn. R. Evid. 402 requires admissible evidence to be relevant, which is defined under Tenn. R. Evid. 401 as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Tenn. R. Evid. 702 states that an expert may testify "[i]f scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue."  One may qualify as an expert by "knowledge, skill, experience, training, or education."  *Id*.  Finally, the portion of Tenn. R. Evid. 703 on which the City focuses states that "[t]he court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness."

We believe Warren met these requirements and the trial court did not abuse its discretion in allowing his testimony.  Warren is a licensed professional engineer with an area of practice predominantly in structural engineering.  Warren offered particular expertise in

the areas of physics and metallurgy, which was especially pertinent to an examination of the effect of time and wear on chains and S-hooks. Warren testified that he familiarized himself with maintenance, safety, and repair protocols in the specific context of playground equipment. He also stated that he has tested playground equipment to examine the metallic properties of a swing set. Warren stated the following about the nature of metals:

> Prior to my deposition involvement in this lawsuit, I have tested materials and would submit to you and to the Court that their use in a playground—piece of playground equipment or use anywhere else is—their use on playgrounds is not unique to playgrounds. The metal, in other words, does not know whether it's being used in a playground or in a structure or in a car. It's going to respond to loads in ways that are predictable but you still check them.

The City cites the following shortcomings with regard to Warren's credentials: he was not certified as a playground safety inspector, was not S.A.F.E. certified, had never been an instructor for certified playground inspector courses, had never manufactured or designed playground equipment, had never written specifications for or installed playground equipment, had never inspected playground equipment, had never performed any audits of playgrounds, had never designed safety inspection tool kits, had never created or designed safety signs for playground equipment, had never taken any classes in playground equipment or recreational safety, and had never been accepted as an expert in any court as an expert in playground equipment or recreational safety. The City points out these alleged deficiencies presumably because they represent a list of its own expert's accomplishments. However, the credentials of the defendant's expert has no bearing on the admissibility of the plaintiff's expert's testimony. Additionally, Warren's testimony was arguably more instructive on the issue at hand—the opening of S-hooks and the physics of the swinging motion—than that of the City's expert, whose particular expertise was in designing and inspecting playground equipment. Furthermore, the City's expert also testified about the slow-opening nature of S-hooks, stating that he recommends checking them only monthly.

Based on the record before us, we conclude that Warren possesses the education and experience that qualify him to render an expert opinion regarding the potential for S-hooks to open up over time and to cause an accident like the one that occurred in the present case. Warren's testimony was relevant, substantially assisted the trier of fact, and did not indicate a lack of trustworthiness. The trial court did not abuse its discretion in allowing Warren's testimony.

CONCLUSION

The judgment of the trial court is affirmed. Costs of appeal are assessed against the appellant, for which execution may issue if necessary.

_____
ANDY D. BENNETT, JUDGE